UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

THOMAS JOHN HEILMAN,
CDCR #H-76785,

　　　　　　　　　　　　　Plaintiff,

v.

J. COOK, et al.,

　　　　　　　　　　　　　Defendants.

Case No.: 14-CV-1412 JLS (AGS)

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

(ECF Nos. 151, 155, 172)

　　　　Presently before the Court is Plaintiff Thomas John Heilman's Motion for Summary Judgment, ("Pl.'s MSJ," ECF No. 155), as well as Defendants Jessica Cook, David Donoghue, and Robert J. Davis's Response in Opposition to, ("Pl.'s MSJ Opp'n," ECF No. 159), and Plaintiff's Reply in Support of, ("Pl.'s MSJ Reply," ECF No. 176), Plaintiff's MSJ. Also before the Court is Defendants' Motion for Summary Judgment, ("Defs.' MSJ," ECF No. 151), as well as Plaintiff's Response in Opposition to, ("Defs.' MSJ Opp'n,"[1] ECF No. 174), and Defendants' Reply in Support of, ("Defs.' MSJ Reply," ECF No. 178), Defendants' MSJ. The Court vacated the hearing on the parties' cross motions for summary judgment and took them under submission without oral argument pursuant to Civil Local

---

[1] Plaintiff also seeks leave of the Court to exceed the legal brief page limitation in his response in opposition to Defendants' Motion for Summary Judgment. (ECF No. 172.) After reviewing the motion, and good cause appearing, the Court **GRANTS** Plaintiff's motion (ECF No. 172).

Rule 7.1(d)(1). (ECF No. 180.) After considering the parties' arguments and the law, the Court rules as follows.

## BACKGROUND

Plaintiff was an inmate at the Richard J. Donovan Correctional Facility ("RJD") when the relevant events in this case occurred. (*See generally* First Amended Complaint ("FAC"), ECF No. 18.) He contends that on May 9, 2013 he was beaten by correctional officers in his cell in the administrative segregation unit at RJD (hereinafter the "Incident"). (Defs.' MSJ Mem. 7[2] (citing FAC 3), ECF No. 163.)[3] He alleges that these correctional officers concocted a story that Plaintiff was seen hanging with a noose around his neck so they had a plausible reason for forcibly extracting him from his cell.[4] (*Id.* (citing FAC 4, 8–9).) After the Incident, Plaintiff was taken to be evaluated by RJD medical personnel. (*Id.*) Defendants are medical professionals who worked at RJD at the relevant time: Dr. Jessica Cook is a Doctor of Osteopathy who was working in the Triage and Treatment Area ("TTA"), Nurse David Donoghue is a Registered Nurse who was working in the Crisis Treatment Center ("CTC"), and Dr. Robert Davis is a psychiatrist who was working in the CTC. (*Id.* (citing FAC 9–12).)

Within approximately fifteen minutes of the Incident, a psychiatry technician documented areas of redness around Plaintiff's body, and noted his complaint of pain to his left anterior thorax and an abrasion/scratch on his cheek. (*Id.*) He documented that Plaintiff was "clear for psych assessment; no first aid indicated per RN." (*Id.* (citing Declaration of Bruce Barnett ("Barnett Decl.") ¶ 26, ECF No. 151-3).) About an hour later

---

[2] Pin citations to docketed material refer to the CM/ECF numbers electronically stamped at the top of each page.

[3] The Court cites to Defendants' statement of facts for background purposes only, avoiding any alleged facts that Plaintiff disputes. The Court later draws all reasonable inferences from the evidence in favor of the nonmoving party when assessing each party's respective motion for summary judgment.

[4] Plaintiff has a separate lawsuit pending against the correctional officers for the alleged beating. *See Heilman v. Silva, et al.*, Case No. 13-cv-02984 JLS (AGS).

Plaintiff was evaluated by a psychiatric social worker, who noted that Plaintiff was disheveled, manic, uncooperative, angry, and agitated, and that the plan was for Plaintiff to be evaluated by psychiatry. (*Id.* (citing Barnett Decl. ¶ 11).) Shortly thereafter Dr. Nizamani performed a psychiatric evaluation on Plaintiff, and noted that Plaintiff was agitated, refused to give any history, and was uncooperative. (*Id.* at 8.) Dr. Nizamani noted some external injuries, and also assessed Plaintiff with mixed affective state and multiple risk factors for suicide. (*Id.* (citing Barnett Decl. ¶ 12, and Ex. C, ECF No. 151-12, at 6).) The plan was to admit Plaintiff to a mental health crisis bed in the CTC. (*Id.*)

Within less than three hours of the Incident, Plaintiff was interviewed about the Incident on video-tape, which shows the external injuries Plaintiff claims to have sustained as a result of the Incident. (*Id.* (citing Declaration of Dion Arguilez ("Arguilez Decl.") ¶ 4, ECF No. 151-7, and Ex. A, ECF No. 151-10).)

Defendant Donoghue also assessed Plaintiff prior to his admission into the CTC. (*Id.*) Donoghue documented that Plaintiff was uncooperative during the examination and refused to have his vital signs taken, but also checked a box titled "ABNORMAL BREATH SOUNDS." (*Id.*; *see also id.* Ex. C, at 10.) Prior to admission into the CTC, Donoghue determined that Plaintiff had not been medically cleared by the TTA, so he sent Plaintiff to the TTA for examination and an x-ray. (Defs.' MSJ Mem. 8 (citing Declaration of David Donoghue ("Donoghue Decl.") ¶¶ 4–7, ECF No. 151-5).) Once at the TTA, Registered Nurse Lacorum evaluated Plaintiff for medical clearance prior to his admission to the CTC. (*Id.* at 9.)

Defendant Davis also evaluated Plaintiff in the CTC on May 9, 2013, noting several external injuries. (*Id.* (citing Barnett Decl. ¶ 24, and Ex. C, at 12).) Plaintiff informed Davis that he had been kicked in the ribs and complained of difficulty breathing on his left side that caused him to cough a lot, which Davis explained could be a result of being kicked in the ribs. (*Id.* (citing Declaration of Robert J. Davis ("Davis Decl.") ¶ 5, ECF No. 151-6).)

14-CV-1412 JLS (AGS)

Davis took Plaintiff's vital signs, which were all normal. (*Id.*) Davis noted crepitus[5] in Plaintiff's left lung and indicated that chest x-rays should be completed if not already done and ordered that x-ray when he completed his admission orders. (*Id.* (citing Davis Decl. ¶ 6, and Ex. C, 10–14).) Davis also assessed Plaintiff with depressive disorder, and ordered Plaintiff to be observed in the CTC and to have 24-hour per day one-to-one monitoring while in the CTC. (*Id.* (citing, e.g., Ex. C, at 15–16).) Notations of Plaintiff's activities every fifteen minutes documented that Plaintiff's respirations were unlabored, that he was eating his meals, and that he was sleeping. (*Id.* (citing Barnett Decl. ¶ 36, and Ex. C, at 17–39).)

On May 13, 2013, Plaintiff underwent another chest x-ray. (*Id.*) That same day the CTC Interdisciplinary Treatment Team, which included Dr. Davis and others, conferred and determined that Plaintiff did not need medical care and thus discharged Plaintiff from the CTC. (*Id.* (citing Barnett Decl. ¶¶ 31, 32, and Ex. C, at 54).)

On May 16, 2013, Plaintiff's x-rays were read and the radiologist stated that Plaintiff had a left sided 30-40% pneumothorax (collection of air or gas in the chest or pleural space that causes part or all of a lung to collapse) of indeterminate age. (*Id.* at 11.) Plaintiff was transported to Alvarado Hospital for further evaluation. (*Id.* (citing Barnett Decl. ¶ 32, and Ex. C, at 59–75).) The hospital assessed him with 35-40% left lung pneumothorax, and, by May 20, 2013, four days after admission, Plaintiff underwent a thoracotomy (incision into the chest or pleural space) to address his injury. (*Id.* (citing Ex. C, at 64–69).) Plaintiff was discharged from the hospital back to RJD on May 25, 2013. (*Id.* (citing Barnett Decl. ¶¶ 37–39, and Ex. C).) Shortly thereafter Plaintiff was sent back to the hospital to address an

///

_____

[5] According to Defendants, "[c]repitus is a term of art that describes a crackling sound or feeling of mild crackling, like crumpled freezer paper, under affected skin. The finding of crepitus can indicate air within damaged tissues. But other physical phenomenon can also produce the sounds of crepitus including fluid normally in lungs that are not fully expanded, or arthritic changes in joints. The presence of crepitus at the time of evaluation was not by itself sufficient evidence upon which to diagnose a pneumothorax." (Defs.' MSJ Mem. 10 n.3 (citing Barnett Decl. ¶ 26).)

infection he contracted at the surgical site. (*Id.* (citing Barnett Decl. ¶¶ 37–39, and Ex. C, at 76–84).)

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

The Court considers each party's cross motion for summary judgment in turn, beginning first with Defendants' Motion for Summary Judgment.

## I. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on several of Plaintiff's claims. First, Defendants argue that there are no genuine disputes of material fact which could support a finding that any Defendant violated the Eighth Amendment or that Davis and Cook violated Plaintiff's due process rights under the First and Fourteenth Amendments.[6] (Def.'s MSJ Mem. 6.) Second, Defendants argue that they are entitled to qualified immunity. (*Id.*) The Court addresses each argument in turn.

### A. Eighth Amendment

An inmate has an Eighth Amendment right to adequate physical and mental health care. *Doty v. Cty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). Deliberate indifference to the serious medical needs of an inmate is inconsistent with the basic standards of human decency and antithetical to the Eighth Amendment's proscription of "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

A determination of deliberate indifference involves a two-step analysis consisting of both objective and subjective inquiries. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

---

[6] Plaintiff alleges that certain Defendants violated his "due process" rights under the First and Fourteenth Amendments. (*See* FAC 2.) However, he states that these Defendants violated his "First and [Fourteenth] Amendment due process rights . . . for retaliation and concealment/falsification of information." (*Id.*) Liberally construing Plaintiff's pleadings, it appears that he asserts violations of his due process rights under the Fourteenth Amendment and separately for retaliation in violation of his First Amendment rights. (*See, e.g.*, Pl.'s MSJ Mem. 83 (arguing a retaliation claim under the First Amendment).) Accordingly, the Court considers Plaintiff's claims under these formulations.

First, the plaintiff must demonstrate a serious medical need such that failure to provide treatment could "result in further significant injury" or "unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Second, the plaintiff must show that the defendant's response to the medical need was deliberately indifferent. *Id.* (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).

Deliberate indifference consists of (1) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (2) harm caused by the indifference. *Id.* Such indifference may be manifested when "prison officials deny, delay[,] or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). This standard is one of subjective recklessness. *Farmer*, 511 U.S. at 839–40. "To satisfy this subjective component of deliberate indifference, the inmate must show that prison officials 'kn[e]w [ ] of and disregard[ed]' the substantial risk of harm, but the officials need not have intended any harm to befall the inmate; 'it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (alterations in original) (quoting *Farmer*, 511 U.S. at 837, 842). "'Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment.'" *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004)); *Estelle*, 429 U.S. at 106.

### 1. Dr. Cook

Defendants argue the undisputed facts demonstrate that Cook did not act with deliberate indifference to Plaintiff's serious medical needs and thus she is entitled to summary judgment. (Defs.' MSJ Mem. 15.) Specifically, Defendants argue (1) Cook never actually examined Plaintiff; (2) Cook reasonably relied on Lacorum's observations in assessing Plaintiff's conditions; and (3) even if Cook did not fully examine Plaintiff when

she should have, Plaintiff was uncooperative and did not allow the staff to fully examine him. (*Id.* at 15–17.)

The Court disagrees with Defendants. To begin, Cook claims that she never actually examined Plaintiff, relying instead on Lacorum's observations and notations. (*Id.* at 15.) While Cook "do[es] not recall examining Plaintiff on May 9, 2013 . . . [partially] due to the lack of records showing that [she] conducted a physical examination of Plaintiff," (Declaration of Jessica Cook ("Cook Decl.") ¶ 5, ECF No. 151-4), Plaintiff explains that other Defendants' Answers to his operative Complaint at least create genuine issues of material fact regarding whether Cook did, in fact, examine Plaintiff on May 9, 2013. (*See* Defs.' MSJ Opp'n 174.) The Court agrees. Indeed, both Defendants Davis and Donoghue identified Cook as the physician who examined Plaintiff and medically cleared him.[7] (Pl.'s MSJ Mem. Ex. D (Defs. Davis's and Donoghue's Ans. to Pl.'s First Am. Compl. ("Davis & Donoghue Ans.") ¶ 7, ECF No. 155, at 98–106 ("Defendants admit that Defendant J. Cook was a Doctor of Osteopath at RJD, employed by CDCR, and that [s]he evaluated Plaintiff, who complained of pain to his body, ordered x-rays, and authorized Plaintiff's admission to the CTC for suicide monitoring." (emphasis added)))).) Thus, drawing all reasonable inferences in Plaintiff's favor, as the Court must do, genuine issues of material fact remain regarding whether Cook personally evaluated Plaintiff. Because this conflicting evidence calls into question Cook's contention that she simply relied on Lacorum's notations of Plaintiff's condition in making her medical recommendations, the Court cannot say as a matter of law that Cook was not deliberately indifferent to Plaintiff's

---

[7] Defendants argue that these Answers are inadmissible evidence for summary judgment purposes. (Pl.'s MSJ Opp'n 16 (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)).) The Court disagrees. In *American Title*, the Ninth Circuit clearly held that a "statement in a complaint, answer or pretrial order is a judicial admission, as is a failure in an answer to deny an allegation," and "[f]actual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them." *Id.* While the Court agrees with Defendants that Davis's and Donoghue's statements are not binding as to Cook, they at least raise a genuine issue of material fact that Cook personally evaluated Plaintiff on the day of the Incident.

medical needs. Defendants will, of course, be entitled to offer Cook's explanation to the trier of fact. Accordingly, the Court **DENIES** this portion of Defendants' Motion for Summary Judgment.[8]

### 2. Nurse Donoghue

Defendants argue the undisputed facts demonstrate that Donoghue did not act with deliberate indifference to Plaintiff's serious medical needs and thus he is entitled to summary judgment. (Defs.' MSJ Mem. 16–19.) Specifically, Defendants argue that Donoghue appropriately sent Plaintiff back to the TTA to have x-rays and a physical completed because he had not yet been medically cleared by the TTA. (*Id.* at 17 (citing Donoghue Decl. ¶ 7).)

Plaintiff has not refuted any of this evidence or otherwise demonstrated that Donoghue acted with deliberate indifference to his medical needs. Instead, Plaintiff "alleges the majority of [Donoghue's] assertions . . . to be fabricated to justify [Donoghue's] decision to deny, delay, or intentionally withhold medical treatment" for his injury. (Def.'s MSJ Opp'n 53–54.) Plaintiff also claims that Donoghue "tried to make it hard on [Plaintiff] to explain his medical injuries" and ridiculed him for "getting what he deserved" as a result of the alleged beating. (*Id.* at 54.) But Plaintiff provides no evidence to corroborate these allegations.

That said, Plaintiff has identified a genuine issue of material fact that prevents a grant of summary judgment in Donoghue's favor. Specifically, when assessing Plaintiff at the CTC, Donoghue checked a box titled "ABNORMAL BREATH SOUNDS" and noted "No S/S of TB" as well as something unintelligible. (*See Id.* Ex. M, ECF No. 155, at 198; *see also* Defs.' MSJ Mem. Ex. C, at 10 (same).) Defendants argue that "this was a mistaken mark because Plaintiff refused to allow Nurse Donoghue to assess his breath sounds. Had

---

[8] For this reason, the Court cannot assess the merits of Defendants' alternative argument that Cook is shielded by qualified immunity. *See, e.g., Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) ("Given the district court's determination that there is a triable issue as to deliberate indifference, the doctors were not entitled to summary judgment on the ground that they could reasonably have believed their conduct did not violate clearly-established law." (citing *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992))).

Nurse Donoghue actually heard abnormal breath sounds, a description of the problem would be noted on the form." (Defs.' MSJ Mem. 17 (citing Donoghue Decl. ¶ 5).) But Defendants provide no other evidence corroborating this mistaken mark or Donoghue's explanation. Without more, this declaration is insufficient to create an <u>undisputed</u> fact that Donoghue mistakenly checked this box. Thus, a genuine dispute of material fact remains regarding whether Donoghue was aware of Plaintiff's abnormal breathing and whether in light of that knowledge Donoghue was deliberately indifferent to Plaintiff's serious medical needs in the course of medical care he administered. Defendants will, of course, be entitled to explain this alleged scrivener's error to the trier of fact. Accordingly, the Court **DENIES** this portion of Defendants' Motion for Summary Judgment.[9]

### 3. *Dr. Davis*

Defendants argue the undisputed facts demonstrate that Davis did not act with deliberate indifference to Plaintiff's serious medical needs and thus he is entitled to summary judgment. (Defs.' MSJ Mem. 19–23.) The Court agrees.

The undisputed facts show that Davis, a staff psychiatrist, physically and mentally examined Plaintiff for the CTC's records. (*Id.* at 19 (citing Davis Decl. ¶ 4).) Among other things, Plaintiff told Davis he had difficulty breathing on the left side that caused him to cough a lot, and Davis explained that if he had been kicked in the ribs, as he claimed, this could cause Plaintiff to experience pain when breathing. (*Id.* (citing Davis Decl. ¶ 5).) Additionally, on May 9, 2013 Davis took Plaintiff's vital signs, which were all normal. (*Id.* (citing Davis Decl. ¶ 6).) Specifically, Davis claims that "there was no evidence of shortness of breath, difficulty breathing, inadequate air flow into or out of the lungs, or rapid respirations, which would support a determination of respiratory distress, though pain may have made breathing uncomfortable for Plaintiff." (Davis Decl. ¶ 6.) Davis noted some

_____

[9] For this reason, the Court cannot assess the merits of Defendants' alternative argument that Donoghue is shielded by qualified immunity. *See, e.g.*, *Jackson*, 90 F.3d at 332.

crepitus in Plaintiff's lungs and thus noted that a chest x-ray should be completed if it had not already been. (*Id.*) But Davis noted that this crepitus indicated the movement of air, not the absence of lung breath sounds. (*Id.*) In sum, based on his evaluation of Plaintiff, Davis claims that Plaintiff "did not show any signs or symptoms of someone that was experiencing a serious medical condition or experiencing medical (respiratory) distress indicative of someone in a medically emergent situation." (*Id.* ¶ 7.) Instead, after Plaintiff's physical examination with Davis, Plaintiff requested and ate all of his food, washed himself, and appeared to be sleeping with unlabored breathing. (*Id.*) Thereafter Davis had no personal knowledge of the medical treatment plaintiff received once he was admitted into the CTC. (*Id.*)

On May 9, 2013 Davis also assessed Plaintiff for mental health issues and determined that Plaintiff would have 24 hour one-to-one monitoring while in the CTC. (*Id.* ¶ 8.) Davis also evaluated Plaintiff on May 10 and 13, 2013, and the notes from those assessments indicate that "xray results presumed negative"; because he received no x-ray report, he presumed that the chest x-ray was read as normal/negative by the radiologist. (*Id.* ¶ 9.) On May 13, 2013 the CTC Interdisciplinary Treatment Team, of which Davis was a member, determined that plaintiff did not need medical care and would be discharged from the CTC. (*Id.* ¶ 8.)

Plaintiff's challenges to Defendants' evidence are not convincing. For one, Plaintiff argues that Defendants "have contrived to present conflicting and contradictory statements . . . in an attempt to mitigate Defendant Davis'[s] role and responsibility . . . ." (Defs.' MSJ Opp'n 39.) For instance, Plaintiff points to Defendants' claim that on May 9, 2013 Plaintiff would not allow his vitals to be taken, and the seemingly contradictory statement that Plaintiff allowed Davis to take his vitals. (*Id.* at 42.) But these are not mutually exclusive—that Plaintiff was uncooperative with, for example, Donoghue does not necessarily mean that he was so with Davis. Nor does Plaintiff actually dispute that he was cooperative with Davis and allowed him to take certain measurements.

/ / /

Additionally, Plaintiff argues that instead of assisting or providing him with medical care, Davis "intentionally ignored [his] complaints and symptoms of [difficulty breathing] and ordered [him] placed on 24 hour one-to-one 'suicide' monitoring while in the CTC." (*Id.* at 45.) Plaintiff argues that this conduct was "in line with 'the plan,' the 'plausible alibi' contrived by [the Defendants in his related case] to justify [his] admission into the CTC . . . ." (*Id.* at 45–46.) These arguments fail. First, Plaintiff provides no evidence that Davis intentionally ignored his complaints. To the contrary, Plaintiff admits that Davis ordered a chest x-ray to assess the extent of his crepitus and determine what steps, if any, were thereafter required to address his breathing problems. And Plaintiff further admits that when he continued to complain of pain, on May 10, 2013, Davis ordered <u>another</u> chest x-ray to additionally cover his "lateral chest" and "traumatized" area. (*Id.* at 46 (citing Pl.'s MSJ Mem. Ex. I, ECF No. 155, at 147).) Indeed, Davis ordered this second x-ray despite the fact that on May 10, 2013 Davis noted that the "[first] xray results [were] presumed negative" because he received no x-ray report. (Davis Decl. ¶ 9.) While Plaintiff may have wanted more or different medical treatment, "Eighth Amendment doctrine makes clear that '[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.'" *Hamby*, 821 F.3d at 1092 (quoting *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012)); *cf id.* at 1094 ("At worst, the evidence in the record shows a difference of medical opinion amounting to possible negligence on the part of Drs. Hammond and Smith. As such, even when the evidence is viewed in the light most favorable to Hamby, 'we cannot say that only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have . . . acted as [the officials here] did.'" (quoting *Mullenix*, 136 S. Ct. at 310)).

Moreover, Plaintiff provides no evidence that Davis placed him in the CTC as part of some conspiracy or "plan" with other prison officials to deny him adequate medical care. Nor does he provide any evidence refuting or even questioning Davis's statement that he "was following prudent action in the care of a patient regarded as suicidal when referred

/ / /

for admission to the CTC." (Davis Decl. ¶ 11; *see also id.* (noting that he is not aware of any documents supporting Plaintiff's claim that he assessed Plaintiff as being "suicidal").)

In sum, while Plaintiff chiefly argues that his condition should not have been ignored, (Defs.' MSJ Opp'n at 48), Plaintiff has not demonstrated that Davis ignored his condition, much less that he acted with deliberate indifference. Nor has Plaintiff rebutted Davis's contention and evidence that Plaintiff was not exhibiting any overt signs of a patient in an emergency situation which might otherwise have supported a claim that Davis should have done more. (*See also* Defs.' MSJ Mem. Ex. A ("DVD Heilman Interview"), ECF No. 151-10 (depicting Plaintiff in a video interview, hours after the incident, without noticeable breathing problems); *id.* (discussing various alleged injuries but never mentioning breathing problems).) Without more, the Court cannot conclude that Davis was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on this point.[10]

### B. Fourteenth Amendment

Defendants also move for summary judgment on Plaintiff's due process claims, arguing there are no genuine issues of material fact that Davis and Cook violated Plaintiff's due process rights under the Fourteenth Amendment. (Defs.' MSJ Mem. 23–26.)

The Fourteenth Amendment to the United States Constitution provides, among other things, that no state shall deprive a person of life, liberty, or property without due process of law. "A section 1983 claim based upon procedural due process thus has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). "A

---

[10] For this reason the Court does not reach Defendants' alternative argument that Davis is entitled to qualified immunity.

liberty interest can arise from one of two sources—either the Due Process Clause of the Fourteenth Amendment or state law." *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013) (citing *Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir. 1992)).

"'[L]awfully incarcerated persons retain only a narrow range of protected liberty interests.'" *Id.* at 1062–63 (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). "Thus, '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.'" *Id.* (quoting *Montanye v. Haymes*, 427 U.S. 236, 242 (1976)). "Under *Sandin* [*v. Conner*], a prisoner possesses a liberty interest under the federal constitution when a change occurs in confinement that imposes an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) (quoting *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000)) (alteration in original) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995))). "*Sandin* makes clear that the focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (citing *Sandin*, 515 U.S. at 483–84); *see also Resnick*, 213 F.3d at 448 (noting that the *Sandin* Court "relied on three factors in determining that the plaintiff possessed no liberty interest in avoiding disciplinary segregation: (1) disciplinary segregation was essentially the same as discretionary forms of segregation; (2) a comparison between the plaintiff's confinement and conditions in the general population showed that the plaintiff suffered no 'major disruption in his environment'; and (3) the length of the plaintiff's sentence was not affected"). "'What less egregious condition or combination of conditions or factors would meet the test requires case by case, fact by fact consideration.'" *Jackson*, 353 F.3d at 755 (quoting *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)).

/ / /

/ / /

### 1. Dr. Davis

Defendants argue they are entitled to summary judgment on Plaintiff's claim that Davis violated Plaintiff's due process rights under the Fourteenth Amendment. (Defs.' MSJ Mem. 25–26.) Plaintiff alleges that Davis "falsified information on official state documents" by stating that Plaintiff was "suicidal" after being discovered with an alleged "noose." (FAC 22.) He further argues that Davis refused to believe that he was not suicidal despite the alleged absence of ligature or strangulation marks around Plaintiff's neck. (*Id.*) Thus, Plaintiff argues that Davis violated his rights to due process "under the First and Fourteenth Amendments . . . ." (*Id.*)

The Court agrees with Defendants. First, as Defendants point out, Plaintiff does not identify a protected property or liberty interest that Davis allegedly violated, either under state or federal law. Liberally construing Plaintiff's pleadings and moving papers, it is possible Plaintiff argues that being placed in the CTC for four days to assess his mental health, including a 24-hour one-to-one monitoring, somehow violated a protected liberty interest under the Fourteenth Amendment. (*See, e.g.*, Defs.' MSJ Opp'n 33 ("[Plaintiff's] Fourteenth Amendment Due Process rights were violated when the Defendants employed several instances of falsifying official state (CDCR) medical records/information to . . . admit [Plaintiff] involuntarily into a Mental Health Crisis Bed (MHCB) unit under false pretenses for an alleged failed suicide attempt . . . .").) But Plaintiff fails to offer any authority demonstrating that this short-term, mental health monitoring within the prison facility was not "within the range of confinement to be normally expected" by prison inmates "in relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. at 486–487, thus requiring due process under the Fourteenth Amendment. *See Resnick*, 213 F.3d at 484–87; *Chappell*, 706 F.3d at 1063 (collecting citations for the proposition that "[t]ransfer to less amenable quarters for non-punitive reasons has been held to be 'ordinarily contemplated by a prison sentence'"); *cf. id.* ("Only the most extreme changes in the conditions of confinement have been found to directly invoke the protections of the Due Process Clause, such as involuntary commitment to a mental institution, or the forced

administration of psychotropic drugs . . . ." (citations omitted)); *Vitek v. Jones*, 445 U.S. 480 (1980) (holding that the involuntary transfer of a state prisoner to an outside mental hospital implicates a liberty interest protected by the Due Process Clause). To the contrary, courts have found that similar short-term psychiatric evaluations do not implicate a protected liberty interest under the Fourteenth Amendment. *See, e.g.*, *Jefferson v. Helling*, 324 F. App'x 612, 613 (9th Cir. 2009) ("The district court also properly granted summary judgment on Jefferson's due process claim arising from his emergency transfer to a prison's mental health unit because Jefferson failed to offer any authority that he was entitled to a hearing prior to the short-term emergency detention."); *Hill v. Wamble-Fisher*, No. 1:11-CV-00101-REB, 2013 WL 3223634, at *5 (D. Idaho June 24, 2013) ("Plaintiff was transferred to the mental health unit so the prison could address an emergency mental health situation, and it does not appear that Plaintiff was confined in the MHU for more than 30 days. In light of the serious mental health problems Plaintiff was experiencing at the time he was placed in the MHU, this period of time does not trigger due process protections."); *Gonzales v. Carpenter*, No. 9:08-CV-629 LEK/ATB, 2011 WL 768990, at *11 (N.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, No. 9:08-CV-629 LEK ATB, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011) ("This court concludes that temporary confinement of an inmate with clear mental health problems for a total of less than 30 days for observation and evaluation in the psychiatric unit within a prison does not implicate a liberty interest." (citing, e.g., *Jefferson*, 324 Fed. App'x at 613)). Thus, the Court concludes that Plaintiff's brief confinement for observation and evaluation in the psychiatric unit within RJD prison (the CTC) does not implicate a liberty interest under the Fourteenth Amendment.

That said, Plaintiff claims that Davis falsified information on state documents in order to admit him into the CTC. But Plaintiff fails to provide any evidence of this alleged falsification, nor does he even identify which documents Davis is alleged to have falsified. (*See* Defs.' MSJ Opp'n 49–51.) And Davis is "not aware of any documents that support Plaintiff's claim that [he] assessed Plaintiff as being 'suicidal.'" (Davis Decl. ¶ 11.) Rather,

14-CV-1412 JLS (AGS)

Davis explained that in prescribing this brief admittance into the CTC he was "following prudent action in the care of a patient <u>regarded as suicidal when referred for admission to the CTC</u>." (Davis Decl. ¶ 11 (emphasis added).) Even if that characterization was erroneous, "[a] prisoner has no constitutionally guaranteed immunity from being wrongly or falsely accused of conduct which may result in the deprivation of a protected liberty interest." *Deadmon v. Grannis*, No. 06CV1382-LAB (WMC), 2008 WL 595883, at *7 (S.D. Cal. Feb. 29, 2008) (quoting *Lopez v. Celaya*, 2008 WL 2025256, at *5 (N.D. Cal. Jan. 23, 2008) (citing, inter alia, *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989))). In the end, Plaintiff simply "<u>alleges</u> Defendant Davis had knowledge and information that [he] was not suicidal" and that this was all part of "'the plan' contrived by the [related case] Defendants to explain [his] injuries as caused by an attempted suicide by hanging." (Defs.' MSJ Opp'n 51 (emphasis added).) Of course, mere allegations are insufficient at the summary judgment stage, and thus Plaintiff has failed to rebut Defendants' arguments and proffered evidence. Accordingly, the Court **GRANTS** this portion of Defendants' Motion for Summary Judgment.[11]

### 2. *Dr. Cook*

Defendants argue they are entitled to summary judgment on Plaintiff's claim that Cook violated Plaintiff's due process rights under the Fourteenth Amendment. (Defs.' MSJ Mem. 23–25.) Plaintiff alleges that Cook "falsified information on official state documents that [his] serious internal injuries were the result of a 'spontaneous secondary pneumothorax.'" (FAC 6.) Thus, Plaintiff alleges that Cook "has violated [his] right to due process under the [First] and [Fourteenth] Amendments . . . to deliberately portray falsely

---

[11] In his reply in support of his own Motion for Summary Judgment, Plaintiff claims that the "Defendants have <u>not</u> filed an opposition to [his] First and Fourteenth Due Process Claims against Defendant [Davis] as stated in Pl.'s MSJ, and thus concede those claims as to the Court's finding for [Plaintiff] and entitling [Plaintiff] to judgment as a matter of law." (Pl.'s MSJ Reply 24 (emphasis added).) However, it does not appear that <u>Plaintiff</u> specifically addressed these claims as to Davis in his opening brief, so there was nothing for Defendants to rebut. (*See generally* Pl.'s MSJ Mem.) Additionally, he specifically addressed his due process (in actuality, retaliation) claim as to Defendant Cook. (*See id.* at 83–85.) Accordingly, the Court declines to adopt Plaintiff's conclusion.

14-CV-1412 JLS (AGS)

a scenario under which [he] could have suffered such a serious internal injury to conceal fellow CDCR prison staff unlawful conduct and to impede [his] ability to prosecute responsible CDCR staff members in court action." (*Id.* at 21.)

The Court agrees with Defendants. As an initial matter, Plaintiff fails to identify a protected property or liberty interest involved with either an alleged concealment of unlawful conduct or an ability to prosecute certain persons in court. To be sure, Plaintiff argues that this alleged falsification violates his liberty interest under California Penal Code section 134 because it is a felony to "prepare false documentary evidence." (Defs.' MSJ Opp'n 35.) But Plaintiff fails to demonstrate—let alone argue—that this provision of the California penal code creates a cognizable liberty interest. *Cf. Franklin v. Knowles*, 428 F. App'x 777, 778 (9th Cir. 2011) (noting that prisoners do not have a protected liberty interest in earning work time credits under the California Penal Code and collecting authority). To the contrary, this provision simply codifies the crime of preparing false documentary evidence. It does not purport to establish any substantive or procedural rights, much less contain "'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow[,]" that is required for a state statute to create a constitutionally protected liberty interest. *Carver v. Lehman*, 558 F.3d 869, 875 (9th Cir. 2009) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989), and *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)). Accordingly, Plaintiff has failed to demonstrate that California Penal Code section 134 creates a cognizable liberty interest entitling him to due process.

Nor does Plaintiff's description of the alleged events clarify a protected property or liberty interest. Specifically, Plaintiff alleges that on May 16, 2013, when Cook submitted a form requesting Plaintiff be transported to Alvarado Hospital, Cook noted that her request for Plaintiff's medical treatment stemmed from his injury resulting from an "altercation." (*Id.* at 30 (citing Ex. B).) But upon returning from surgery at the hospital, and in sending Plaintiff back to deal with a later-developed infection, Cook submitted a new medical request form on June 11, 2013 and apparently removed any reference to Plaintiff's injury

resulting from an "altercation." However, Plaintiff fails to explain how this alleged discrepancy in notation implicates any property or liberty interest under the Fourteenth Amendment. For instance, Plaintiff does not complain that he was sent to the hospital for treatment against his will, or that Cook or other staff seized any of his property. This alone is fatal to Plaintiff's claim.

But Plaintiff's claim would fail even if he did identify a protected property or liberty interest. Specifically, Plaintiff argues that Cook falsely attributed his lung injury to a "spontaneous" event as opposed to "blunt force trauma beating by prison guards." However, Plaintiff has presented no evidence that Cook falsified any documents, nor has he at least presented any evidence creating a genuine issue of material fact as to that claim. Rather, at core Plaintiff's argument with Cook's characterization of his injury as "spontaneous" is that she "presents <u>no</u> evidence as to this diagnosis." (Defs.' MSJ Opp'n 34 (emphasis in original).) But that is not true. To the contrary, Defendants explain that the term "spontaneous" is "merely an indication that the doctor does not know the etiology of the pneumothorax, which can have numerous etiologies, including but not limited to, coughing, a bleb,[12] smoking, drug use, <u>blunt force</u>, secondary to congenital pathology, etc." (Defs.' MSJ Mem. 24 (citing Barnett Decl. ¶ 42) (emphasis added).) In other words, Defendants argue that the term "spontaneous" could also include trauma from a beating, and thus it was not improper for Cook to indicate in the records that Plaintiff sustained a "spontaneous" pneumothorax. (*Id.*) And, as already discussed, "Eighth Amendment doctrine makes clear that '[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.'" *Hamby*, 821 F.3d at 1092 (quoting *Snow*, 681 F.3d at 987).

---

[12] According to Defendants, "[b]lebs are small sacks of air in lung tissue, and when they rupture, they can cause a pneumothorax. Typically, a bleb does not cause any symptoms. Blebs can rupture for a variety of reasons, including coughing or a very sudden deep breath." (Defs.' MSJ Mem. 24 (citing Barnett Decl. ¶ 44).)

In his opposition brief Plaintiff further argues that "Defendants" (which ostensibly includes Cook) violated his due process rights by falsifying certain state documents in order "to admit [him] involuntarily into a Mental Health Crisis Bed (MHCB) unit under false pretenses for an alleged failed suicide attempt . . . [despite Plaintiff's] complaint that he [was] <u>not</u> suicidal, and his injuries are viewed as <u>inconsistent</u> with an alleged suicide attempt by hanging with a 'noose tied around his neck.'" (Defs.' MSJ Opp'n 33–34 (emphasis in original); *id.* at 35 (noting that Cook's alleged falsification created an "atypical and significant" hardship for Plaintiff much different than those ordinarily experienced by inmates).)

The Court disagrees. As discussed above, *supra* Section II.B.1, the Court concludes that Plaintiff's brief confinement in the CTC does not implicate a protected liberty interest under the Fourteenth Amendment. Moreover, as with Davis, Plaintiff argues that Cook falsified documents in order to admit him into the CTC. But Plaintiff has not demonstrated that Cook falsified any documents, nor has he even identified which documents Cook allegedly falsified in order to admit him into the CTC. Rather, as discussed, Plaintiff's chief concern with Cook is her notation that his injury was "spontaneous" when she requested Plaintiff be sent to Alvarado Hospital on June 11, 2013, which was <u>after</u> he was released from the CTC. (*See, e.g.*, Defs.' MSJ Opp'n 17 (admitting that Plaintiff was removed from the MCHB unit on May 13, 2013).) Accordingly, Plaintiff has failed to rebut Defendants' arguments and evidence and thus the Court **GRANTS** this portion of Defendants' Motion for Summary Judgment.

## II.    Plaintiff's Motion for Summary Judgment

Plaintiff also moves for summary judgment on his claims that the Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, and that Defendants Cook and Davis also violated his First and Fourteenth Amendment rights. (*See generally* Pl.'s MSJ Mem.) Given the Court's rulings above, *see supra* Part I, the Court briefly addresses Plaintiff's contentions.

/ / /

14-CV-1412 JLS (AGS)

### A. Eighth Amendment

To begin, the Court has already held that Davis is entitled to summary judgment that he was not deliberately indifferent to Plaintiff's serious medical needs. *See supra* Section I.A.3. In so holding, the Court also considered Plaintiff's proffered argument and evidence in his opening brief in support of his Motion for Summary Judgment. (*See, e.g.*, Pl.'s MSJ Mem. 80–83 and accompanying exhibits.) Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment as to his claim that Davis violated his Eighth Amendment rights.

Plaintiff also moves for summary judgment on his claims that Cook and Donoghue were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. (*See id.* at 79.) Plaintiff's motion fails.

As to Cook, drawing all reasonable inferences from the evidence in Cook's favor, Plaintiff's evidence does not establish that as a matter of law Cook was deliberately indifferent to his serious medical needs. (*Id.* at 80–83.) Specifically, as Defendants note, Plaintiff simply cites to medical records which were not authored by Cook. (Pl.'s MSJ Opp'n 12.) Thus, these medical records do not unquestionably demonstrate that Cook was actually aware of the range of Plaintiff's alleged injuries, including his claim that he was having severe breathing difficulties. Moreover, Cook states under oath that she "do[es] not recall examining Plaintiff on May 9, 2013, and due to the lack of records showing that [she] conducted a physical examination of Plaintiff and the notification by Nurse Lacorum of his findings, [she] can only surmise that [she] ordered the facial x-ray based upon Nurse Lacorum's examination of Plaintiff, wherein he complained of jaw pain." (Cook Decl. ¶ 5.) As with Defendants' Motion for Summary Judgment, Cook's declaration creates a genuine issue of material fact as to whether she was aware of Plaintiff's alleged serious medical needs, and thus the Court cannot hold as a matter of law that Cook was deliberately indifferent to those same needs. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment on his claim that Cook violated his Eighth Amendment rights.

/ / /

As to Donoghue, drawing all reasonable inferences from the evidence in Donoghue's favor, Plaintiff's evidence does not establish as a matter of law that Donoghue was deliberately indifferent to his serious medical needs. (Pl.'s MSJ Mem. 82–83 (citing Exs. M–P).) Exhibit M, prepared by Donoghue, notes that Plaintiff was uncooperative, hostile, demanding, and did not allow a complete assessment. (*Id.* Ex. M, at 198–99).) While Donoghue checked a box titled "ABNORMAL BREATH SOUNDS," (*id.* at 198), Donoghue declares under oath that this was a mistaken mark, which, as discussed above, *supra* Section I.A.2, at least creates a genuine issue of material fact. Plaintiff fails to explain the relevance of Exhibit N, which is a medical document dated May 13, 2013, four days after Donoghue evaluated Plaintiff on May 9, 2013. Exhibit O is Donoghue's Responses to Set One of Plaintiff's Interrogatories. (*Id.* at 203.) Not only does Plaintiff fail to identify which portions of Donoghue's responses demonstrate his deliberate indifference, Donoghue's responses actually corroborate his notations in the medical records that, among other things, Plaintiff was uncooperative, hostile, and did not allow Donoghue to fully assess his vitals. (*Id.* at 203–13.) Similarly, Exhibit P corroborates Donoghue's explanation that he mistakenly checked the incorrect box when noting that Plaintiff exhibited abnormal breath sounds. (*Id.* at 216.) In sum, Plaintiff has failed to offer undisputed evidence that Donoghue was deliberately indifferent to his alleged serious medical needs. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment on his claim that Donoghue violated his Eighth Amendment Rights.

### B. First and Fourteenth Amendments

Plaintiff also moves for summary judgment on his claims that Cook and Davis violated his due process rights under the Fourteenth Amendment. However, the Court has already held that Cook and Davis are entitled to summary judgment that they did not violate Plaintiff's due process rights. *See supra* Section II.B. In so holding, the Court also considered Plaintiff's proffered argument and evidence in his opening brief in support of his Motion for Summary Judgment. (*See, e.g.*, Pl.'s MSJ Mem. 83–85 and accompanying exhibits.) Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment as

to his claims that Cook and Davis violated his due process rights under the Fourteenth Amendment.

But Plaintiff also moves for summary judgment on his claim that Cook violated his First Amendment rights under a theory of retaliation. (Pl.'s MSJ Mem. 83.) Specifically, Plaintiff argues that, in retaliation for Plaintiff's filing a grievance against certain prison personnel, Cook falsified official state records in order to help the correctional officers succeed on the merits in Plaintiff's related case. (*Id.* at 83–84.)

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)). "In the prison context, a claim for First Amendment retaliation under § 1983 must establish five elements: '(1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'" *Howard v. Foster*, 208 F. Supp. 3d 1152, 1159 (D. Nev. 2016) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005)). "The filing of an inmate grievance is protected conduct." *Watison*, 668 F.3d at 1114. The adverse action does not need to be an independent constitutional violation, and the mere threat of harm can be an adverse action. *Id.* "A causal connection between the adverse action and the protected conduct can be alleged by an allegation of a chronology of events from which retaliation can be inferred." *Howard*, 208 F. Supp. 3d at 1159 (citing *Watison*, 668 F.3d at 1114).

In support of his Motion, Plaintiff relies on Cook's alleged falsification of medical documents when, in sending Plaintiff back to the hospital to treat his infection, she noted that his lung injury occurred as a result of a "spontaneous" event. (Pl.'s MSJ Mem. 84 (citing Ex. R); *see also supra* Section II.B.2.) But, to the contrary, Plaintiff contends that his injury occurred "from the beating [he] endured at the hands of four (4) correctional officers," and raises the question "why would [Cook] do this?" (*Id.*)

Plaintiff's Motion fails. As an initial matter, Plaintiff has provided no evidence that Cook actually falsified this document by noting that Plaintiff's injury occurred after a "spontaneous" event. Quite the opposite, drawing all reasonable inferences from the evidence in Cook's favor, the record reflects that a "spontaneous" event can include injury from blunt force trauma (i.e., Cook's notation encompassed even Plaintiff's account of his injury). (Barnett Decl. ¶ 42.) But Plaintiff's retaliation claim would fail even if he demonstrated that Cook falsified this medical document. Specifically, Plaintiff has provided no evidence that Cook was actually aware that Plaintiff filed any grievances, much less that she acted adversely to Plaintiff *because of* those grievances. Thus, Plaintiff has failed to establish a causal connection between his protected exercise (filing of the grievance) and Cook's allegedly retaliatory conduct (falsifying a medical document). Nor has he alleged, much less demonstrated, that this alleged retaliation chilled his exercise of his First Amendment rights. In sum, Plaintiff has failed to establish that as a matter of law Cook retaliated against him in violation of his First Amendment rights. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment as to his claim that Cook violated his rights under the First Amendment.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 151), and **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 155).

**IT IS SO ORDERED.**

Dated: May 23, 2017

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

24